11 GUIDRY, Chief Judge.
This personal injury suit arises from a July 5, 1991 automobile accident which occurred on Louisiana Highway 105 near Melville, Louisiana. Plaintiff, Patsy Naquin, was driving a pickup truck, in which her three daughters were passengers, when she was forced off of the highway by a vehicle driven by defendant, Benjamin Teer. Patsy and her husband, Marcus Naquin, individually and on behalf of Melissa, Christie and Laeie Naquin, sued Teer, Louisiana Indemnity Company, Teer’s liability insurer, and Prudential Property and Casualty Insurance Company, plaintiffs’ uninsured motorist (UM) insurer. Louisiana Indemnity had issued an insurance policy to Teer which provided |2for bodily injury liability limits of $10,000 per person, $20,000 per accident. Plaintiffs sought recompense for Patsy’s low back injury, Marcus’ loss of consortium, and the three daughters’ fear, fright, and emotional injuries. Because suit was filed by more than one person, Louisiana Indemnity’s potential exposure for plaintiffs’ damages is $20,000.
On March 10, 1993, one day prior to the commencement of trial, plaintiffs compromised their claims against Prudential. Judgment dismissing Prudential, with full reservation of rights as to the remaining defendants, was not signed, however, until June 9, 1993. On the morning of trial, plaintiffs amended their petition to eliminate Prudential as a party defendant and to declare that the damages suffered by each of them were below the $20,000 jurisdictional monetary requirement for a jury trial. Thereafter, the matter proceeded to a bench trial. After taking the case under advisement, the trial court rendered written reasons for judgment on May 27, 1993. The judge found Teer solely at fault and awarded $19,999.99 to Patsy, $5,000 to Marcus, and $100 to each of the three children. The court signed a judgment in accordance with these reasons on July 1, 1993.
On July 8, 1993, Teer and Louisiana Indemnity moved for a new trial on damages and to present evidence of the aforementioned compromise into the record to obtain a credit for the amount paid by Prudential. In response, plaintiffs filed a motion to strike the compromise and any reference to payments by Prudential because defendants failed to introduce any evidence pertaining thereto at trial. Plaintiffs’ motion to strike was granted by court order rendered and signed on July 14, 1993. The court then denied defendants’ motion for new trial as untimely on July 20, 1993.
| -¡Teer and Louisiana Indemnity appeal from the July 1,1993 judgment on the merits and the July 20, 1993 order denying a new trial. Plaintiffs did not appeal or answer defendants’ appeal.
The defendants assign the following errors:
1) awarding excessive damages to Patsy and Marcus Naquin;
2) failing to recognize the compromise amount paid by Prudential and credit or offset the award by that amount;
3) awarding more damages than the $20,-000 maximum limit stipulated to between the parties; and,
*995 4) denying defendants’ motion for new trial.
For the following reasons, we affirm the damage awards but make the awards subject to a credit or offset in the amount of $5,299.99 paid by Prudential, plaintiffs’ UM insurer.

FACTS

This accident occurred at approximately 2:15 p.m. in rainy weather. The vehicles in question did not collide. As Teer, who was traveling northbound, rounded a curve, he began to lose control of his Toyota Célica. When Teer attempted to regain control, the rear-end of the vehicle swung around 180 degrees, and it began traveling backwards. The Naquins, who were entering the curve in the southbound lane, swerved to the right to avoid a collision with Teer’s vehicle. Their truck came to rest in the ditch bordering the roadway. Neither vehicle was damaged. Louisiana State Police Trooper Dave Laugh-lin was dispatched to the scene and completed an accident report.
Patsy testified that she saw Teer’s car weaving into and out of her lane. It then became perpendicular to the center line and proceeded to turn completely around so that the front of the vehicle was facing a southerly Rdirection. She explained that, had she not driven off the road and into the ditch, her truck would have broadsided Teer’s car. Patsy did not feel pain at first, but she began to have a “burning pain” in her low back and legs after arriving home. Her husband took her to Doctors Hospital in Opelousas, where she was diagnosed with a pulled back muscle. She thereafter saw her family physician, Dr. Michael Basile, who diagnosed a lumbar strain. He prescribed physical therapy and a CT scan, which yielded negative results. Dr. Basile referred Patsy to an orthopedic surgeon, Dr. Thomas Butaud, who recommended further testing including a magnetic resonance imaging (MRI) test, an electro-myogram, and a bone scan. Patsy declined to undergo these tests for financial reasons. She next was examined by Dr. Stephen Gold-ware, a neurosurgeon, who also recommended further testing to include a myelo-gram and a post-myelogram CT scan. She once again declined to undergo these tests for financial reasons and because she was afraid of the myelogram.
Patsy stated that, since the accident, her low back and right leg pain has increased in intensity. Her leg sometimes becomes numb and “goes out” on her. She stated that she was in pain while testifying. She further explained that her injury has drastically reduced her ability to do household work and to participate in familial activities such as bike riding, tennis, and fishing. She has become irritable and hollers at her husband and children frequently. Patsy does nothing with her family now and the frequency and quality of her sex life has dramatically decreased. She declined the myelogram because her husband had undergone several myelograms in the past and he became very sick afterwards.
| sMarcus testified that Patsy complained of low back pain on the night of the accident. Her complaints have persisted since then and, according to Marcus, her pain has become more severe. He stated that they got along well before the accident, but the nature of their marital relationship has greatly changed. Since then, Patsy does no housework and is very irritable. Marcus stated that their sexual relations have become infrequent as compared to before the accident and lacking in quality.
Melissa, Christie, and Lacie Naquin each testified similarly that their mother began complaining about her back on the day of the accident and continued to do so. They also corroborated her testimony concerning her reduced participation in family activities.
Dr. Basile examined Patsy on July 9 and 16, 1991. She complained of low back and right hip and leg pain. He detected low back muscle spasms. He diagnosed a lumbar strain and recommended physical therapy. Dr. Basile saw her again on July 29, 1991 at which point he diagnosed possible sciatic nerve inflammation and recommended a CT scan.
The CT scan was performed on August 21, 1991 and was interpreted by Dr. Leon Las-trapes, III, a radiologist. He stated on the report that the CT scan, which was “... *996 somewhat limited by artifact and graininess, related to the size of the patient, show[ed] no evidence of an acute focal disc herniation or spinal stenosis”. He did detect mild disc bulges at L3^ and L4-5. In deposition, Dr. Lastrapes explained that the scan film image was not so grainy such that the mild bulges could not be detected. There was no disc herniation even considering the loss of image quality on the film.
Based on the result of this CT scan, Dr. Basile referred Patsy to Dr. | f;Butaud, who saw her once on September 6, 1991. She complained to him of pain in her lumbar spine radiating down to her right foot. Dr. Butaud noted a positive Lasegue test, which is a straight leg raise followed by ankle dorsi-flexion. He stated that he could not determine if she had a disc problem without additional tests. He opined that her complaints, more probably than not, were related to the accident.
Dr. Goldware saw Patsy on September 26, 1991. He observed her limping on her right lower extremity and she complained of pain on the straight.leg raising test. This, according to Dr. Goldware, strongly suggests a pinched nerve in her low back. He discounted the CT scan results because of the graininess of the image on film. He opined that there is a 51% probability that she has a L5-S1 ruptured disc. However, he stated emphatically that he would not perform surgery without the results of a myelogram and a post-myelogram CT scan. If surgery is warranted, he charges $3,200 and the hospital stay costs between $5,000 and $10,000.

QUANTUM

In awarding general damages, the discretion vested in the trier of fact is “great”, and even vast, such that an appellate court should not disturb an award in the absence of a clear abuse of that discretion. Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), citing Reck v. Stevens, 373 So.2d 498 (La.1979) and Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). We can only disturb an award if it is, in either direction, “... beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances ...” of each case. Id.
|7The evidence indicates that Patsy suffered a lumbar spine muscular strain which may or may not have worsened with the passage of time. The evidence of worsening is purely subjective in the absence of further diagnostic testing. Patsy was under the care of Dr. Basile and saw Drs. Butaud and Goldware once each. She has not had medical attention for this condition since September, 1991. Thus,- the trial court was presented with an injury of at least two and one-half months duration which plaintiff claims worsened subsequently. Under these circumstances, although the award of $19,-999.99 is at the high end of what a reasonable factfinder could award, we nevertheless determine that this award is not an abuse of the trial court’s vast discretion.
Defendants also characterize as excessive the $5,000 loss of consortium award to Marcus. This award is also reviewable pursuant to the “abuse of discretion” standard. The compensable elements in a loss of consortium claim are loss of society, sex, service and support. La.C.C. art. 2315(B). “Society”, which is broader than sexual relations, includes love, companionship and affection that the spouse loses as a result of the injury. “Support” is the lost family income that would otherwise support the uninjured spouse. “Service” is the uncompensated household work or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source at a price. Girard v. Price, 606 So.2d 990 (La.App. 3rd Cir.1992).
The record indicates that Marcus’ level of society, sex and service from Patsy was drastically reduced after the injury. The trial court’s conclusion that he suffered a loss of consortium is reasonable. The amount awarded, while |8also on the high end of reasonableness under the circumstances, is within the trial court’s discretion.

STIPULATION OF MAXIMUM DAMAGES

Defendants contend that the trial court erred in rendering judgment in the *997 amount of $25,299.99, which exceeded the $20,000 amount stipulated to prior to trial as the maximum damages sought by plaintiffs. In other words, defendants assert that the judge erred as a matter of law by rendering a judgment in an amount greater than the maximum jurisdictional limit required for a bench trial.
Defendants’ reading of the applicable law and the stipulation is erroneous. When this case was tried, La.C.C.P. art. 1732 provided, in pertinent part, as follows:
A trial by jury shall not be available in: (1) A suit where the amount of no individual petitioner’s cause of action exceeds twenty thousand dollars exclusive of interest and costs.[1] (Emphasis ours)
The stipulation resulted from a paragraph in plaintiffs’ first supplemental and amending petition, in which plaintiffs stated that “... the injuries and damages suffered by each of them herein are below the jurisdictional requirement for a jury ..(Emphasis ours). The stipulation was entered into the record at trial as follows:
MR. AUBREY [plaintiffs’ attorney]:
... we were going to ammend [sic] to reduce the demand to below the jurisdictional requirement for a jury. We’ve prepared a motion to amend. I’ve given Mr. Soileau a copy and I presume he has no objection to that at all, and we would file that at this time, Your Honor.
|9THE COURT: The amendment is that the recovery is not going to exceed the jurisdictional amount, is that correct? MR. AUBREY: That’s correct, Your Hon- or. The suit is now on behalf of Mrs. Naquin ...
THE COURT: I understand.' Not that the value of the damages might not be higher, it’s just that recovery cannot, in this case, go over $20,000.
MR. SOILEAU [Defense Attorney]: Right.
MR. AUBREY: Exactly, Your Honor. (Emphasis ours)
La.C.C.P. art. 1732(1) controls a claimant’s right to trial by jury depending upon the amount that he positively states he is seeking for the alleged damages. Without violating La.C.C.P. art 893, which prohibits a party from praying for a specific monetary amount except in limited circumstances (such as to establish the right to a jury trial), plaintiffs can assert that the amount sought is either more or less than $20,000 to obtain either a jury or judge trial. Plaintiffs’ amendment and the subsequent stipulation were both to the effect that recovery would not exceed the “jurisdictional amount”, i.e., $20,000 for each individual petitioner’s cause of action. Although defense counsel appears to have understood at trial and argues now on appeal that the stipulation limited the total award to all plaintiffs to $20,000, this is simply not the ease when the stipulation, which specifically mentions the “jurisdictional amount”, is read in context with La.C.C.P. art. 1732(1). Clearly, the judgment is not violative of La. C.C.P. art. 1732(1) nor does it award more than the amount per claimant stipulated to as the maximum recovery.

COMPROMISE AND OFFSET

Defendants assert that the trial court erred in failing to recognize their I ^entitlement to an offset of $10,000, the amount paid in compromise by plaintiffs’ UM insurer, Prudential. The compromise was agreed to on March 10,1993, the day prior to trial. No documentary evidence of the compromise was entered into the record at trial other than the judgment dismissing plaintiffs’ claims against Prudential. However, at trial, Patsy admitted, as did her attorney, that a compromise was entered into with Prudential. The following colloquy occurred as defendants’ attorney questioned Patsy:
Q. Ms. Naquin, you settled with Prudential this past week, didn’t you, your UM carrier?
A. Yes, sir.
Q. How much was your settlement for? MR. AUBREY: Your Honor, I’m not really sure that’s relevant. It’s a UM carrier.
*998 It could clearly come behind it. As long as Mr. Soileau understands that he and his client does not somehow get credit for any uninsured motorist settlement, though, I have no problem with putting the settlement documents into the record.
MR. SOILEAU: And, Your Honor, I’d like the settlement documents to go in, and Mi*. Aubrey is wrong. The tort-feasor does get credit for the UM carrier. We’re solidary obligors with Prudential, and I have Fertitta v. Allstate, which is a Supreme Court case (La.1985) which specifically states it.
Q. How much did you settle with the UM carrier?
A. I’m not really sure.
MR. SOILEAU: Mr. Aubrey, do you have the settlement papers?
MR. AUBREY: Not the completed settlement papers, no.
Q. Isn’t it true that your UM carrier actually paid $2,700 of medical expenses and $7,300 of UM, and it came out to $10,000?
MR. AUBREY: Your Honor, again, objection. I think that we have collateral source problem in addition to my other objection.
MR. SOILEAU: Again; Your Honor, it’s relevant to that.
THE COURT: Let it go subject to the objection.
InA. I guess so.
Additionally, at the end of the first day of trial, the attorneys and the judge engaged in the following discussion:
MR. SOILEAU: Your Honor, we’d like to hold open the evidence as far as the settlement documents. I guess we’ll bring that in if I can get them, Monday morning — the settlement documents with Prudential as far as the credit is concerned.
THE COURT: Well, I’ll tell you what this ease says. This case says that plaintiffs insurer — I mean defendant’s insurer and the UM are solidarily liable and consequently gets credit. That’s what it says.
MR. AUBREY: What’s the name of the case, Judge?
THE COURT: Fertitta v. Allstate, 462 So.2d 159. It’s an old ease — ’85.
Despite the apparent recognition of Fertitta v. Allstate Insurance Company, 462 So.2d 159 (La.1985), as controlling in this ease, the trial court failed to recognize defendants’ entitlement to an offset or credit for any amount paid by the UM insurer.
In Fertitta, the UM insurer settled with plaintiff on the morning of trial for $32,000. Plaintiff then proceeded to trial against the tortfeasor and his liability insurer and won a $48,701.11 judgment. The Supreme Court reasoned that the UM insurer and the tort-feasor were solidarily bound, by separate legal provisions, to repair plaintiffs damages to the extent that they exceeded the limits of the tortfeasor’s liability insurance policy. See also, Hoefly v. Government Employees Insurance Co., 418 So.2d 575 (La.1982). In Fertitta, the Supreme Court explained the effect of payment by the UM insurer as follows:
Because the two debtors are solidarily bound, the creditor can demand performance of the entire obligation from either obligor as if he were the sole debtor. Moreover, payment (or partial I i2ipayment) to the creditor by one debtor exonerates the other debtor from having to make that payment to the creditor (although the debtor who pays may have resulting rights against the other debtor). Stated otherwise, when the liability is soli-dary, the creditor cannot collect more than the full amount of the debt for the single or combined payments of the debtors. Therefore, solidarity is not inconsistent with the purpose of providing full recovery to the tort victim.
The court then concluded that the $32,000 payment on the solidary obligation by the UM insurer must be imputed to the debt owed by the tortfeasor, the other solidary obligor.
In the case sub judice, the court recognized the existence of the compromise and plaintiff Patsy’s testimony on cross-examination was sufficient to prove that the amount paid by Prudential, her UM insurer, was $10,000. The trial court erred in not recognizing defendant Teer’s entitlement to the *999 offset. We will amend the judgment to ree-ognize that Teer is entitled to a $5,299.99 offset of the amount owed in judgment.

NEW TRIAL

Defendants’ motion for new trial was denied as having been filed untimely in violation of La.C.C.P. art. 1974. The judgment herein was signed and notice thereof was mailed to counsel on July 1, 1993. Defendants’ motion for new trial was filed on July 8,1993. The trial court denied the motion on July 20, 1993.
La.C.C.P. art. 1974 provides, in pertinent part, as follows:
The delay for applying for a new trial shall be seven days, exclusive of legal holidays. Except as otherwise provided in the second paragraph hereof, this delay commences to run on the day after the judgment was signed.
Clearly, defendants’ motion for new trial was not untimely and the trial court erred in ruling otherwise. However, the issues addressed in defendants' | ^motion, i.e., damages and Teer’s right to offset, are completely disposed of in this opinion and, therefore, the merit of appellants’ contention on the new trial issue is rendered moot.

DECREE

For the above and foregoing reasons, the judgment of the trial court is amended as follows:
It is ordered, adjudged and decreed that there be judgment in favor of Patsy Na-quin and against Benjamin Teer and Louisiana Indemnity Company in the amount of $19,999.99;
Further, it is ordered, adjudged and decreed that there be judgment in favor of Marcus Naquin and against Benjamin Teer and Louisiana Indemnity Company in the amount of $5,000;
Further, it is ordered, adjudged and decreed that there be judgment in favor of Melissa Naquin and against Benjamin Teer and Louisiana Indemnity Company in the amount of $100;
Further, it is ordered, adjudged and decreed that there be judgment in favor of Christie Naquin and against Benjamin Teer and Louisiana Indemnity Company in the amount of $100;
Further, it is ordered, adjudged and decreed that there be judgment in favor of Lacie Naquin and against Benjamin Teer and Louisiana Indemnity Company in the amount of $100;
The liability of Louisiana Indemnity Company for the awards set forth above is limited to its policy limits, i.e., $20,000. The aggregate of the above awards is subject to a credit in favor of Benjamin Teer in the amount of $5,299.99.
Costs of these proceedings are assessed one-half (½) to plaintiffs and one-half (⅜) to defendants.
AFFIRMED AS AMENDED.

. This portion of the statute was amended by Act No. 661, Sec. 1 of 1993 to increase the requisite minimum amount to fifty thousand dollars.